246 So.2d 479

Earl **BENEFIELD**

v.

**STATE.**

**5 Div. 4.**

Court of Criminal Appeals of Alabama.

June 23, 1970.

Rehearing Denied Aug. 25, 1970.

Reversed after Remandment March 30, 1971.

Hooton & Hooton, Roanoke, for appellant.

MacDonald Gallion, Atty. Gen., and Richard F. Calhoun, Asst. Atty. Gen., for the State.

CATES, Judge.

This is an appeal from a conviction of embezzlement, Code 1940, T. 14, § 126. Sentence, three years imprisonment.

The indictment reads (omitting caption, signature and words not important here):

"The Grand Jury * * * charge that * * * Earl Benefield, alias Earl the Pearl Benefield, R. F. Kelly, alias Bobby Kelly, and James Clark, alias Jim Clark, whose true christian names are otherwise unknown to the Grand Jury, as agents or servants of C. B. Alsobrook did embezzle or convert to their own use, or the use of another, one 1966 model Chevrolet pick-up truck, which had come into their possession by virtue of their said agency or service, said pick-up truck being of the value of one thousand four hundred dollars and being the property of the said C. B. Alsobrook; against the peace and dignity of the State of Alabama."

The State's hypothesis was that Mr. Alsobrook contracted on January 2, 1968 to buy a new 1968 truck from Benefield. As part of the agreement, he turned in (on a consignment basis) a used 1966 Chevrolet pickup truck. The new truck bargained for was not forthcoming. The 1966 truck got on the lot of another dealer one day after Alsobrook turned it over to Benefield, i. e. January 3, 1968.

Alsobrook testified:

"A I turned my 1966 Chevrolet over to him in return for him to get me a new truck, and he give me a 1955 half ton Chevrolet to drive until my new one come.

"Q He was to get you a new truck?

"A Yes, sir.

"Q All right, did he deliver as an agent of yours a new truck?

"A No, sir.

"Q State whether or not you had any conversations with him later about why you hadn't gotten your truck.

"MR. PAUL J. HOOTON: Now we object, if the Court pleases.

"THE COURT: I will let him answer whether he—

"MR. PAUL J. HOOTON: The time and place and who was present.

"A About six or eight times.

"Q Do you know what, if anything, Mr. Benefield did with your truck that he had taken from you?

"A Yes, sir.

"Q What did you find out?

"MR. PAUL J. HOOTON: We object to what he found out.

"Q All right, what do you know he did with it?

"A He traded it to Wesley Benefield.

"MR. PAUL J. HOOTON: I'd like to ask a preliminary question, your Honor.

"THE COURT: Well, you'll have him on cross-examination.

"Q You say you know that he traded it to Wesley Benefield?

"A Yes, sir.

"Q Have you ever gotten your truck back?

"A No, sir.

"Q Did you ever receive a new truck?

"A No, sir.

**594**

"Q What was the value of your truck that you let him have to get you a new one?

"A $1550.00.

"Q You stated that you had some conversations with Mr. Benefield about this?

"A Yes, sir, several times.

"Q What, if anything, did he say to you about it?

"MR. PAUL J. HOOTON: Now we object to that, if the Court pleases.

"THE COURT: Overruled, what the defendant said.

"MR. PAUL J. HOOTON: I'd like to know the time and place.

"THE COURT: Well, fix the time and place, Mr. Solicitor.

"Q All right, do you remember any individual times and places that you talked with him?

"A Well, one time I remember was on the 10th of February. I know that.

"Q Where was that?

"A At his place of business.

"Q And tell the Court and jury what, if anything, was said to you by Mr. Benefield.

"A He kept putting me off and saying he was going to get my new truck.

"Q When was the second time that you talked to him? When did you talk to him after that?

"A Well, the day that I indicted him was the last time that I talked to him.

"MR. PAUL J. HOOTON: We object to that, and move to exclude it.

"THE COURT: That's out, ladies and gentlemen of the jury.

"Q You mean the day that you came before the grand jury?

"A Yes, sir.

"Q What, if anything, did he say to you then?

"A He said a lots of things."

However, for that 1966 truck, he received a check which, with endorsement (State's Exhibit "1"), read as follows:

| | |
|---|---|
| "COMMERCIAL | No. _____ |
| BANK OF ROANOKE | Roanoke, Alabama |
| Member Federal Deposit | January 8  1968 |
| Insurance Corporation | |

"PAY TO

| | |
|---|---|
| The Order of C. B. Alsobrook | $1550.00 |
| THE SUM OF $1,550 and 00 cts | DOLLARS |
| | B & C & K Motors |
| "For 1966 Pick-up | M Benefield |
| Fleetside 10 cab | |
| | R F Kelley |

"Endorsement on Back:        C. B. Alsobrook
"Attached to Check:

RETURNED BY
THE COMMERCIAL BANK OF
ROANOKE, ALA.
Roanoke, Alabama

"X   Insufficient
Funds
Endorsement
Missing
Not as Drawn
Wrong Bank
Signature
Uncollected
Funds
Other Reason
(Specify)

FEB 10 1968"

Also, Alsobrook was lent an interim truck under a document of loan (State's Exhibit "2"):

"1-2-68

"This 1955 Chevrolet ½ ton Blue Pick-up has been loaned to Mr. C B Alsobrook to drive until his new 1968 Pick-up truck has been delivered. Delivery date is 4-6 wks from date ordered.

"B & K Motors
"Earl Benefield
"James D. Clark

"If any additional information is needed please contact B & K Motors Day Phone 6141 Night Phone 2–2013

"Personally approved before me this the 2nd day of January 1968.
  "Louise N. McKenley
  "Notary Public"

On cross, Alsobrook stated:

"Q Now you took the check there at the time you left your car, didn't you?

"A Yes, sir.

"Q And you later on tried to cash it, didn't you?

"A Yes, sir.

"Q And they said it was insufficient funds?

"A Yes, sir.

"Q And you got this check and you took this check when you left your car, your truck?

"A Yes, sir.

"Q And you also gave them this bill of title, I mean this bill of sale to you, didn't you?

"A I give them the bill of sale, yes.
  * * * * * *

"A They told me they would have to order mine.

"Q That they would have to order your car?

"A Yes, sir.

"Q They'd have to put your car on the lot, did't they?

"A He wanted to keep mine and see if he could sell it.

"Q He wanted to keep your car to see if he could sell it? And you told him he could keep it to see if he could sell it?

"A Yes, sir."

On redirect examination, Alsobrook was questioned about the check:

"Q All right, what day did you leave your truck there with Mr. Benefield?

"A The 2nd day of January of this year.

"Q All right, what is the date on that check that Mr. Hooton was talking about?

"A I believe it's the 10th, or the 8th.

"Q In other words, that check is dated six days after you left your truck there?

"A Yes, sir. For security reasons.

"MR. PAUL J. HOOTON: We object.

"Q Tell us about the security reasons about the check.

"A He said if something happened to him that that check would be worth that much money towards his business."

Mrs. Louise McKinley, bookkeeper for B. C. & K. Motors, was called by the defense. She testified, in part:

"Q Well, will you relate to the jury the part that you actually know about that you heard?

"A Jackie Neal, who is the salesman for the motor company, brought Mr. Alsobrook into the office, and he had drawn up—I'm scared to say agreement—but anyway, the difference that Earl would trade Mr. Alsobrook for the truck, which was $950.00.

"MR. YOUNG: Pardon me. Is that on a new truck?

"THE WITNESS: Yes, sir.

"A And Mr. Alsobrook asked questions and so forth, which I don't remember the exact questions, but Earl assured him that he would get a new truck, and gave him a check in lieu of his good faith that he would get the truck.

"Q Now what else was said there?

"A He did explain to Mr. Alsobrooks that in order to operate, since he had no

backing and no financing of his own, that he would have to leave his truck there to be sold in order to have operating capital, and he would put his truck on order.

"Q Now, at that time, did Mr. Alsobrook turn over and give the bill of sale to you all?

"A Mr. Hooton, I remember tag receipts and this (indicating instrument) only, but I—if I'm not mistaken, he had applied for a Georgia tag. Now, I could be wrong.

"Q You could be wrong about that? You are not certain about those two papers right there?

"A I believe these were included. I would say so.

"Q That's your best judgment?

"A Yes, sir.

"Q Now, but you do know that he left this bill of sale from Hines Motor Company to him for this particular truck, pickup truck there with you at the time?

"A Yes, sir, because that's what made me think he had applied for Georgia state title.

"Q I see. And he was told there that they would have to sell his truck, is that right?

"A Yes, sir, try to sell it. It wasn't guaranteed to sell, it was just to use there to sell.

"Q It was left there to be sold?

"A That's right.

"Q And they gave him a check for $1550.00 there at the time?

"A Yes, sir.

"Q Now, you were working for who at that time?

"A Earl hired me.

"Q I know, but for who?

"A B., C. and K. Motors.

"Q B., C. and K. Motors? Who was B., C. and K. Motors?

"A Benefield, Clark and Kelley."

The check, State's Exhibit "1," was given six days after the 1966 truck was turned in and five days after the other car dealer came by it.

Our statute reads:

"Any officer, agent, clerk, employee or servant of any incorporated company, association of persons, partnership, or municipal corporation, or agent, clerk, employee, servant, or apprentice, of any private person or persons, who embezzles or fraudulently converts to his own use, or the use of another, or fraudulently secretes with intent to convert to his own use, or the use of another, any money or property which has come into his possession by virtue of his office, agency, employment, or apprenticeship, shall be punished, on conviction, as if he had stolen it." Code 1940, T. 14, § 126, as amended.

Benefield argues that the partnership B. C. & K. Motors was an entity apart from himself. Apparently his wife was the "B" but it was undisputed that he signed her name to firm papers and checks.

We consider that the subsequent check of January 8, 1968 cannot alter the earlier sale (January 3, 1968) of the 1966 truck to the other dealer, one Wesley Benefield. This is fortified by the lack of a bill of sale from Alsobrook. The Uniform Commercial Code, § 2–201, was not complied with on January 2. Hence, this hiatus lends credence to Alsobrook's testimony that the 1966 truck was left with Benefield as a bailee or agent for sale.

The judgment below is due to be

Affirmed.

AFTER REMANDMENT BY THE SU-
PREME COURT OF ALABAMA

PER CURIAM.

On authority of Benefield v. State, 286
Ala. 722, 246 So.2d 483 (1971) the judg-
ment of the circuit court is reversed and
the cause there remanded for new trial.

Reversed and remanded.